**Ossy E. AHANOTU, Plaintiff,**

v.

**MASSACHUSETTS TURNPIKE AUTHORITY, Massachusetts Highway Department, Matthew J. Amorello, Mike Lewis, Joe Allegro, Marie Hayman, Norman Chalupka, James Esposito, Bechtel/Parsons Brinkerhoff, Matt Wiley and Ted Vander Els, Defendants.**

**Civil Action No. 06–10197–NMG.**

United States District Court, D. Massachusetts.

Dec. 8, 2006.

Benneth O. Amadi, Law Office of Benneth O. Amadi, Lynn, MA, Obinna Duruji, Rev. Uduak James Ubom, Ubom Law Group, PLLC, Washington, DC, for Plaintiff.

James A. Wingfield, Robert L. Kilroy, Mirick, O'Connell, Demallie & Lougee, LLP, Westborough, MA, Jessica H. Munyon, Mirick O'Connell LLP, Worcester, MA, Andrew Neil Hartzell, David J. Hatem, Christian G. Samito, Matthew Mackay O'Leary, Donovan & Hatem, LLP, Mary E. O'Neil, Matthew Q. Berge, Attorney General's Office, Boston, MA, for Defendants.

## MEMORANDUM & ORDER

GORTON, District Judge.

Plaintiff Ossy E. Ahanotu ("Ahanotu") brings an action against his former employers for discrimination and whistleblower retaliation, *inter alia*. Defendants move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted.

## I. *Factual Background*

### A. **Procedural History**

The plaintiff filed a second amended complaint against the Massachusetts Turnpike Authority ("MTA"), MTA officials Matthew J. Amorello ("Amorello"), Mike Lewis ("Lewis"), Joe Allegro ("Allegro"), Marie Hayman ("Hayman"), Norman Chalupka ("Chalupka") and James Esposito ("Esposito") (collectively, "the MTA officials"), the Massachusetts Highway Department ("Mass.Highway"), Bechtel/Parsons Brinkerhoff ("B/PB"), and B/PB employees Matt Wiley ("Wiley") and Ted Vander Els ("Vander Els") (collectively, "the B/PB officials") on August 17, 2006. The second amended complaint alleges violations of Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e *et seq.* ("Title VII"); 42 U.S.C. §§ 1981 and 1983; the Massachusetts Civil Rights Act, codified at M.G.L. c. 12, § 11*I* ("MCRA"); the Massachusetts Equal Rights Act, codified at M.G.L. c. 93, § 102 ("MERA"); the Massachusetts Whistleblower Statute, codified at M.G.L. c. 149, § 185 ("the Whistleblower Statute"); and the Massachusetts Employment Discrimination Act, codified at M.G.L. c. 151B ("Chapter 151B"). The second amended complaint also alleges claims for breach of implied contract, promissory estoppel, intentional and negligent infliction of emotional distress, negligence, wrongful discharge in violation of public policy, and civil conspiracy.

The plaintiff filed his original complaint in this case on January 30, 2006. The original complaint was long (41 pages) and obtuse. The defendants filed motions to dismiss but the plaintiff countered by filing a motion to amend his complaint in support of which he submitted a 52–page version thereof on May 4, 2006 ("the first amended complaint"). The parties then filed a variety of motions and responses prior to a scheduling conference on July 26, 2006. At that scheduling conference, the Court informed the plaintiff and his counsel that both versions of his complaint were overbroad and confusing and suffered from myriad other deficiencies. Rather than allow the pending motions to dismiss, however, the Court denied them without prejudice and advised the plaintiff that he could file one more amended complaint to state concisely his factual allegations and legal causes of action but cautioned the plaintiff that if the Court could not comprehend the second amended complaint, it would be dismissed with prejudice.

On August 17, 2006, the plaintiff filed the second amended complaint.[1] That complaint, while still obscure, was pared down to 28 pages and stated the plaintiff's causes of action with somewhat more clarity. The MTA, the MTA officials, and B/PB have filed the pending motions to dismiss the second amended complaint

---

1. Some confusion arises from the fact that the amended version of the complaint filed on August 17, 2006, is titled "First Amended Complaint." While technically that pleading is the first authorized amended complaint, the plaintiff had previously filed an amended complaint on May 4, 2006 which ultimately was not docketed. For the sake of clarity, the pleading filed on August 17, 2006 will hereinafter be referred to as the "second amended complaint."

pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.[2] Mass. Highway, which was added as a party by the second amended complaint, was granted 30 additional days from October 26, 2006 to file an answer. Any subsequent dispositive motions filed by Mass. Highway will be addressed separately.

## B. Factual Allegations

The plaintiff is an African–American man with an M.S. degree in Construction Management. The second amended complaint alleges that he was employed by Mass. Highway from 1994 until sometime in 1997, and, thereafter, was employed by the MTA until he was terminated on June 30, 2005. Mass. Highway, and later the MTA, were the state agencies responsible for overseeing the multibillion dollar public works project commonly known as "the Big Dig." The plaintiff worked for Mass. Highway, and later the MTA, in a variety of engineering and management roles, including as an Area Construction Manager, a Value Engineering Program Manager and a Material Control Coordinator on the Central Artery/Tunnel portion of the Big Dig.

B/PB is a joint venture of Bechtel Corporation (a California corporation) and Parsons Brinckerhoff Quade and Douglas, Inc. (a New York corporation). B/PB served as the lead engineering management firm on the Big Dig. The plaintiff alleges that beginning in 1997 or 1998, the MTA and B/PB formed an Integrated Project Organization ("IPO") in which the MTA and B/PB had counterparts in each functional area. Although the MTA was supposed to have final responsibility for the direction and management of the Big Dig, the plaintiff contends that the MTA performed little oversight. The plaintiff further alleges that sometime in 1999 or 2000, he was assigned to work under the direct supervision of B/PB manager Vander Els. According to the second amended complaint, Vander Els supervised the plaintiff's work schedule, conducted his performance evaluation, and acted as his superior.

The factual allegations against the defendants can be roughly divided into two groups: instances in which the plaintiff suffered retaliation for reporting fraud or mismanagement with respect to the Big Dig project, and instances in which the plaintiff suffered discriminatory conduct based upon his race. The following description summarizes the plaintiff's factual allegations in a light most favorable to the plaintiff. Some of the events could be construed as actions of either retaliation or discrimination (or both, or neither), but the Court has attempted to categorize them for the sake of clarity.

## 1. Retaliation

The plaintiff alleges the following events which could be construed as acts of retaliation. In August, 1994, the plaintiff reported a water leak in the Route I–90 Tunnel in one of his field reports. Tests were conducted but the plaintiff disagreed with the inspection and repair procedures. He wrote a report to one of his superiors in the MTA stating his objections but the report was never circulated. The plaintiff also allegedly reported his discovery that the Commonwealth had wrongfully paid

---

**2.** At a hearing on October 26, 2006, counsel for B/PB informed the Court that the two individual B/PB employees named in the second amended complaint, Wiley and Vander Els, had not been served. The Court advised counsel to file appropriate pleadings if they saw fit, whereupon Wiley and Vander Els filed a motion to dismiss under Fed.R.Civ.P. 12(b)(5) and (6) which will be dealt with separately.

for the repairs relating to the leak. In February, 1997, the plaintiff contends he was demoted within the Big Dig project by Allegro, then the Director of Construction, in retaliation for those reports.

In August, 1998, in his capacity as the Value Engineering Manager for the MTA, the plaintiff alleges that he recommended a value study on a number of Big Dig contracts. He contends that he identified a total of $3.36 million in potential savings on the project, but that no action was taken on his study. As a result of those reports, the plaintiff contends that he was again demoted and placed under the supervision of B/PB manager Vander Els sometime in 1999 or 2000. He asserts that the MTA ratified his demotion by failing to do anything about the situation despite his complaints to MTA officials.

In June, 1999, the plaintiff alleges that he discovered an additional instance of fraud on the Big Dig in the amount of $2.3 million, but again no action was taken and Allegro told the plaintiff that he could "go places in this project or ... find [himself] in a corner" and to "keep his mouth shut." Also in June, 1999, the plaintiff discovered and reported to Vander Els that a *per diem* contract for independent inspectors had been wrongfully increased from $75 to $165. In response, Vander Els allegedly told the plaintiff "I don't want to hear it again period." Thereafter, the plaintiff contends that Vander Els barred him from weekly staff meetings and additional seminars and courses until his discharge in 2005.

In 2002, the plaintiff inquired about applying for a new job within the MTA for which he purports to have been qualified. Vander Els, however, allegedly told the plaintiff that he could not apply for the job because he might "use the position to get back at people who have done something to" the plaintiff. Nevertheless, the plain-

tiff applied for the job but during his interview MTA officials Lewis and Hayman made it clear to the plaintiff that he was not going to be chosen for the position because of his past actions of reporting fraud and mismanagement at the Big Dig.

On January 8, 2002, Vander Els conducted the plaintiff's annual performance review during which he told the plaintiff his position would be eliminated due to the fact that the Big Dig project was winding down. The plaintiff contends he was the only MTA manager whose performance review was conducted by a B/PB manager. He subsequently requested, on many occasions, an appointment with Allegro to discuss his concerns but every scheduled appointment was cancelled. In March, 2002, Vander Els again intimated that the plaintiff's position might be in jeopardy. The plaintiff responded by informing Vander Els that when he was transferred from Mass. Highway to the MTA he was told that he would stay with the MTA until the end of the Big Dig project, and was further promised by MTA official Bill Flynn ("Flynn") that Flynn would recommend the plaintiff for a permanent position with the MTA after the Big Dig project was completed. In October, 2003, Vander Els again conducted the plaintiff's performance review and told the plaintiff that "the MTA does not know what to do with you."

In April, 2004, the plaintiff sent an email to Vander Els suggesting the necessity of an audit of Big Dig contracts which were coming to an end. Vander Els denied the request. The plaintiff subsequently sent a number of letters to MTA officials reminding them that he was the only MTA manager under B/PB supervision and stating that the situation was not in the best interest of the MTA. The MTA did not respond to those letters.

In September, 2004, the plaintiff took a four-day vacation. When he returned, he

found the contents of his office packed in moving boxes. The plaintiff was then removed from his South Boston office to the MTA headquarters. Later that month, all of the plaintiff's emails were erased and he contends that no other project personnel experienced such treatment.

Beginning in October, 2004, the plaintiff was repeatedly told by Carol Hebb ("Ms. Hebb"), a special project manager for B/PB, that he would be terminated. Ms. Hebb became the plaintiff's supervisor for several months after Vander Els retired. In September, 2004, the plaintiff reported in an email to an MTA official an additional alleged instance of fraud in the amount of $500,000 but he received no response. Mr. Ahanotu was given a 90–day termination notice by Ms. Hebb on October 1, 2004, but he was later told by the MTA to disregard that notice. Ms. Hebb subsequently gave the plaintiff a 30–day termination notice on December 1, 2004, but that notice was later rescinded as well.

In January, 2005, the plaintiff was reassigned to supervision under MTA director Howard Corey ("Mr.Corey"). Mr. Corey allegedly told the plaintiff that the MTA would "find something" for him but not on the Big Dig project because he had "stepped on so many toes." Later, in March, 2005, Corey told the plaintiff "I hope you are looking for a job." The plaintiff then met with Chalupka and Esposito from the offices of MTA Human Resources and Personnel, respectively. He alleges that both Chalupka and Esposito were extremely hostile and told him he would only have a job until the end of June. Approximately one week after that meeting, the plaintiff called Corey to report that he would be out sick. Corey allegedly told the plaintiff "I understand how you feel when they are out to get you." At the end of March, 2005, Corey informed the plaintiff that he would be terminated as of July 1, 2005.

## 2. Discrimination

The plaintiff alleges in the second amended complaint that the treatment described in the preceding section was also motivated by racial discrimination. The following allegations relate more specifically to his discrimination claim.

After the plaintiff was demoted in 1997, he contends that he could not carry out the functions of his new position without an official car. According to the second amended complaint, all similarly situated white employees were provided with official cars and cell phones. The plaintiff alleges that he repeatedly requested from Allegro a car and a phone without success and was told by Allegro that if "I was the Director, you would be out of this Project."

Sometime after being placed under the supervision of B/PB manager Vander Els in 1999 or 2000, the plaintiff alleges that he was transferred from the MTA headquarters, where all the other white project managers had offices, to an isolated office in South Boston. He contends that he was barred from all weekly staff meetings and additional courses and seminars from 1999 through 2005, but that similarly situated white employees were allowed to attend such courses and seminars. Additionally, he alleges that Allegro cancelled every meeting with the plaintiff from 2000 through 2005, but that Allegro met with the plaintiff's white colleagues regularly.

On or about September 20, 2004, a white B/PB manager, Marty Charney ("Charney"), stopped by the plaintiff's office and stood in front of his door. Charney allegedly made an obscene anatomical gesture while mocking the plaintiff with a vulgar and sexually explicit song. The plaintiff reported that incident to the MTA Director of Personnel but it was not investi-

gated by either the MTA or B/PB. In May, 2005, the plaintiff's office and the one next to it, which was occupied by a white B/PB manager, were renovated. The plaintiff alleges that the B/PB manager's office was fitted with an air supply and a ventilation outlet while his was not. He further alleges that his was the only manager's office without an air supply or ventilation. The plaintiff complained to Corey that the situation was not conducive to his health. On May 25, 2005, the plaintiff had a dizzy spell in his office and fainted. His doctor allegedly reported that the spell was due to inadequate ventilation and/or stress in the workplace. During a visit to another doctor on June 27, 2005, the plaintiff was told not to work for a week due to "extreme emotional distress."

On or about June 30, 2005, the plaintiff was finally discharged from the MTA. He alleges that he was the only MTA manager discharged at that time. After his exit interview, the plaintiff asked Corey for recommendation letters but was allegedly told that certain MTA officials had asked Corey and others not to provide him with recommendation letters because they could be "used against the MTA in a lawsuit."

## II. *Legal Analysis*

### A. Legal Standard

■ A court may not dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "unless it appears, beyond doubt, that the [p]laintiff can prove no set of facts in support of his claim which would entitle him to relief." *Judge v. City of Lowell*, 160 F.3d 67, 72 (1st Cir.1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters

of which judicial notice can be taken. *Nollet v. Justices of the Trial Court of Mass.*, 83 F.Supp.2d 204, 208 (D.Mass.2000) *aff'd*, 248 F.3d 1127 (1st Cir.2000). Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir.2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. *See Nollet*, 83 F.Supp.2d at 208.

### B. Analysis

The second amended complaint states ten counts for relief but some of those counts cite multiple statutory and common law causes of action on which relief could be based. Furthermore, each count realleges and incorporates by reference the 113 factual allegations, even though some allegations clearly relate to certain counts but not to others. Under the liberal pleading requirements of Fed.R.Civ.P. 8, however, the second amended complaint will be construed so as to do "substantial justice" and the Court will give the plaintiff the benefit of every doubt. The defendants' motions to dismiss will be analyzed by cause of action rather than by count.

### 1. State Civil Rights Claims are Preempted

■ The defendants move to dismiss the plaintiff's state law civil rights claims under the MCRA and MERA, M.G.L. c. 12, § 11*I* and M.G.L. c. 93, § 102, respectively, because those claims are preempted by Chapter 151B, the Massachusetts Employment Discrimination Act. The plaintiff cites the MCRA and MERA as a basis for relief in Counts One, Two, Three and Eight.

Chapter 151B, which is also invoked throughout the plaintiff's second amended

complaint, provides the comprehensive and exclusive statutory scheme for resolving employment discrimination claims under Massachusetts law. *Green v. Wyman–Gordon Co.*, 422 Mass. 551, 557–58, 664 N.E.2d 808 (1996). Furthermore, at the scheduling conference on July 26, 2006, the Court advised the plaintiff that his MCRA and MERA claims were preempted by Chapter 151B and that they would be dismissed with prejudice if they were brought in the second amended complaint. The MCRA and MERA claims in Counts One, Two, Three and Eight will be dismissed with prejudice.

### 2. Contractual Claims

■■■ Count Four of the plaintiff's second amended complaint alleges breach of implied contract and promissory estoppel. The plaintiff alleges a breach of implied contract generally, and particularly with reference to the promise of a permanent transfer made by Flynn. The allegation that the plaintiff was promised a "permanent stay to the end of the [Big Dig] project," however, is based on the assumption that the plaintiff had a contract for a definitive period of employment in excess of one year that was not capable of being performed within one year of making the contract. Because the plaintiff has offered no evidence of an employment contract with the MTA, the implied contract claim is barred by the Statute of Frauds as the plaintiff was forewarned at the July 26, 2006 scheduling conference. Furthermore, the plaintiff alleges only that Flynn promised to "recommend" the plaintiff for a permanent transfer. That is an illusory promise at best and is not enough to sustain a claim of promissory estoppel. Count Four will be dismissed with prejudice.

### 3. Tort Claims

■■ The plaintiff asserts several tort claims in Counts Five, Six and Seven.

Count Five states a claim for intentional infliction of emotional distress, Count Six for negligent infliction of emotional distress and Count Seven for negligence generally. Claims for intentional and negligent infliction of emotional distress against employers, as well as negligence generally, are barred by the exclusivity provision of the Massachusetts Worker's Compensation Act, M.G.L. ch. 152, §§ 24, 26. *See Clarke v. Kentucky Fried Chicken of California, Inc.*, 57 F.3d 21, 28–29 (1st Cir.1995). The Court forewarned the plaintiff at the July 26, 2006 scheduling conference that such claims were preempted by the Worker's Compensation Act. Counts Five, Six and Seven will be dismissed with prejudice.

### 4. Civil Conspiracy

■■ Count Nine of the second amended complaint alleges civil conspiracy against each and every defendant. In it plaintiff alleges that the defendants had an agreement to participate in the unlawful discrimination and retaliation. The second amended complaint is sprinkled with references suggesting that various MTA and B/PB officials acted as part of a pattern of discriminatory and retaliatory activity. Such conclusory statements are not, however, enough to sustain a claim for civil conspiracy. The Court cautioned the plaintiff at the scheduling conference that civil conspiracy must be pled with particularity. *See Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir.1977) ("It has long been the law in this and other circuits that complaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts"); *Watterson v. Page*, 987 F.2d 1, 9 n. 7 (1st Cir.1993) ("Mere conclusory allegations that defendants 'conspired' are not enough in a civil rights complaint to turn otherwise

lawful action into a valid claim of unlawful conspiracy."). Count Nine will be dismissed with prejudice.

### 5. Wrongful Discharge in Violation of Public Policy

■ Count Eight of the second amended complaint includes a common law claim for wrongful discharge in violation of public policy. Massachusetts courts have repeatedly held that Chapter 151B is the exclusive remedy under state law for employment discrimination claims. *See Green*, 422 Mass. at 557–58, 664 N.E.2d 808. The plaintiff's claim for wrongful discharge in violation of public policy is therefore preempted by Chapter 151B, and may be litigated in accordance with the requirements of that statute. Count Eight also cites various other statutory bases for relief, none of which are availing on a theory of wrongful discharge in violation of public policy. Count Eight will be dismissed with prejudice against all defendants.

### 6. Title VII and Chapter 151B Discrimination Claims

The plaintiff alleges against all defendants hostile work environment in Count Two and discrimination in Count Three in violation of Title VII and the state employment discrimination law, Chapter 151B. In Count One, the plaintiff also alleges retaliation in violation of Title VII. The defendants' various motions to dismiss the Title VII and Chapter 151B claims are addressed as follows.

### a. B/PB's Motion to Dismiss Title VII and Chapter 151B Claims

The defendant B/PB moves to dismiss all discrimination claims arising under Title VII and Chapter 151B. In support of its motion, B/PB contends that: 1) the plaintiff has failed to file an administrative charge of discrimination with either the Equal Employment Opportunity Commission or Massachusetts Commission Against Discrimination accusing B/PB of discrimination, 2) B/PB was not the plaintiff's employer, 3) the Title VII claim is barred by the statute of limitations and 4) the allegations in the plaintiff's second amended complaint are insufficient to state a claim for hostile work environment.

### i. Procedural Requirements

■ B/PB contends that it was not named in the administrative charge filed by the defendant. Before bringing a civil action under Title VII, an individual must file a charge of discrimination with the Equal Employment Opportunity Commission ("the EEOC"), and must receive a notice of right to sue from the EEOC in return. 42 U.S.C. § 2000e–5(f)(1). B/PB does not dispute that the plaintiff in this case filed such a charge with the EEOC, a copy of which was attached to the second amended complaint and is incorporated by reference therein. The dispute is over whether B/PB was properly named in that charge.

Although B/PB contends that it was not named in the EEOC charge, the charge does, in fact, contain a reference to B/PB. The form used for filing an EEOC charge contains a section with the following designation:

> Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

The MTA is named as the plaintiff's employer in that section, which also includes the MTA's mailing address. Below that, however, in the section designated for "PARTICULARS", the plaintiff's narrative states:

From November 28, 2000 continuing up [sic] January 1, 2005, *I worked under the management of the sub-contractor of* [sic] *Bechtel/Parsons Brinckerhoff.* During these five years, I have been subjected to different terms and conditions of employment in that I have been denied access to staff meetings, denied promotions and denied self improvement classes and seminars. (Emphasis added).

Although no address is given for B/PB, it is clearly named in the EEOC charge and is accused of discriminatory practices. The plaintiff subsequently received a notice of right to sue from the Civil Rights Division of the United States Department of Justice. That notice referenced only the MTA as the plaintiff's employer.

 Because B/PB was referenced in the plaintiff's EEOC charge, the Title VII claims against B/PB cannot be dismissed at this stage in the proceedings. The purpose behind requiring a charge to be filed with the EEOC is to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation. *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir.1996). The key factual issue, therefore, is whether B/PB received actual notice of the plaintiff's EEOC charge such that it had an opportunity for early conciliation. It is unclear from the allegations in the second amended complaint or the face of the attached EEOC charge whether B/PB actually received a copy of the EEOC charge from the EEOC or from the MTA.[3] Because a factual determination is necessary as to whether B/PB received notice of the

EEOC charge, B/PB's motion to dismiss the Title VII claims will be denied.

 B/PB also moves to dismiss the Chapter 151B claims on the grounds that the plaintiff failed to meet the procedural requirement of filing a complaint with the Massachusetts Commission Against Discrimination ("MCAD") prior to commencing this lawsuit. M.G.L. c. 151B, §§ 1, 9. Although Chapter 151B requires the filing of an administrative complaint, that requirement was met when the plaintiff filed his charge with the EEOC. Title VII, as amended, provides that upon filing a charge with the EEOC, if the state has a law prohibiting the alleged unlawful practice, the EEOC shall notify the appropriate state or local officials and afford them an opportunity to act under state law to remedy the practice. 42 U.S.C. § 2000e–5(d).

Furthermore, the EEOC charge attached to the second amended complaint contains a section requesting "State or local Agency, if any" to which plaintiff answered "Massachusetts Commission Against Discrimination" and, below that "I want this charge filed with both the EEOC and the State or local Agency, if any." The plaintiff's signature appears on the same page with the date of October 24, 2005.

Interpreting the face of the EEOC charge in a light most favorable to the plaintiff, it appears that reasonable steps were taken to file a charge with the MCAD and the burden shifts to B/PB to demonstrate that no such charge was filed or that B/PB did not receive notice thereof.

**3.** I n its reply to plaintiff's opposition to B/PB's motion to dismiss, B/PB states that it did not receive notice of the conciliation proceedings and did not participate in them. In considering a motion to dismiss, the facts must be construed in a light most favorable to the plaintiff. The EEOC charge filed by the plaintiff raises at least an inference that B/PB received actual notice of the plaintiff's charge. A clear factual dispute exists with respect to that issue and must be resolved during discovery or at trial.

#### ii. "Joint employer" liability

■ Regardless of whether it was properly named on the EEOC charge, B/PB contends that it was not the plaintiff's "employer" at any time, and, therefore, the Title VII and Chapter 151B claims should be dismissed. For purposes of Title VII liability, an entity may be considered a "joint employer" if it possesses sufficient control over the work of an employee of another company. *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). The factors to be considered in determining whether an entity is a joint employer are whether it:

1) supervises the employee's day-to-day activities,

2) has the authority to hire or fire employees,

3) promulgates work rules and conditions of employment,

4) controls work assignments, and

5) issues operating instructions.

*Orell v. UMass Mem. Med. Ctr., Inc.*, 203 F.Supp.2d 52, 62–63 (D.Mass.2002).

■ While the plaintiff does not allege that he was on the B/PB payroll, he does allege facts sufficient to draw an inference that B/PB was a joint employer under the *Orell* test. The second amended complaint alleges that the plaintiff was under the direct supervision of B/PB employees and that B/PB employees conducted his annual performance reviews. The second amended complaint further alleges that B/PB employees threatened to fire the plaintiff on several occasions. Although B/PB vigorously denies that it had the authority to hire or fire the plaintiff, the Court takes the allegations in the second amended complaint as true for the purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Based on the allegations in the second amended complaint, B/PB employees acted with apparent authority to fire the plaintiff. Before dismissal of this claim against B/PB can be resolved, further factual inquiry is required to determine the employment relationship between the MTA, B/PB and the plaintiff.[4]

#### iii. Statute of Limitations

■ Title VII actions are subject to a limitations period of 180 days. 42 U.S.C. § 2000e–5(e)(1). The limitations period begins to run on the date of the retaliatory or discriminatory act. *National R.R. Passenger Corp. ("Amtrak") v. Morgan*, 536 U.S. 101, 110, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The plaintiff alleges that he was discharged from employment by the MTA on or about June 30, 2005. He filed his EEOC charge on October 24, 2005, within the 180-day limitations period.

B/PB contends, however, that the allegations in the second amended complaint specifically implicating B/PB occurred more than 180 days prior to the filing of the plaintiff's EEOC charge and that the Title VII claim is therefore barred by the statute of limitations. The last act alleged by the plaintiff that could possibly be construed as an act of discrimination or retaliation occurred on December 30, 2004, when B/PB supervisor Carol Hebb delivered to the plaintiff a termination notice. That event, as well as all other alleged discriminatory actions of B/PB, occurred more than 180 days before the filing.

4. In an affidavit attached to B/PB's reply to the plaintiff's opposition to B/PB's motion to dismiss, Lori Soloway, a human resources manager employed by Bechtel and assigned to the Big Dig project, states that: "There are *no employees* of Bechtel/Parsons Brinckerhoff, a joint venture of Bechtel Infrastructure Corporation and PB." (emphasis added). The Court is puzzled as to how an entity charged with management of the Big Dig project could have "no employees", and wonders with others where the $14 billion went.

■ In his opposition, however, the plaintiff argues that the "continuing violation" doctrine tolls the statute of limitations. *Amtrak*, 536 U.S. at 116–17, 122 S.Ct. 2061. The plaintiff has alleged that he was subjected to a discriminatory hostile work environment. Because a hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice, the timely filing provision requires only that a Title VII plaintiff file a charge within a certain number of days after the last of the alleged discriminatory actions. *Id.* at 117, 122 S.Ct. 2061.

■ The First Circuit Court of Appeals has set forth a three-part test for determining the sufficiency of a serial continuing violation claim:

1) Is the subject matter of the discriminatory acts sufficiently similar such that there is a substantial relationship between the otherwise untimely acts and the timely acts?

2) Are the acts isolated and discrete or do they occur with frequency or repetitively or continuously?

3) Are the acts of sufficient permanence that they should trigger an awareness of the need to assert one's rights?

*O'Rourke v. City of Providence*, 235 F.3d 713, 731 (2001) (emphasis and internal citations omitted). Applying that test to the facts alleged in the second amended complaint, the plaintiff has set forth sufficient allegations to find a serial continuing violation. The allegations against B/PB in the second amended complaint include, but are not limited to, the following:

that sometime in 1999, the plaintiff was singled out, demoted, and placed under the supervision of B/PB employee Vander Els;

that Vander Els barred the plaintiff from weekly staff meetings which the plaintiff's white colleagues were invited to attend;

that Vander Els denied plaintiff the opportunity to attend additional seminars and courses from 1999 to 2004 while his similarly situated white colleagues attended such seminars and courses;

that in 2002, Vander Els twice told the plaintiff his position would be eliminated, and that the plaintiff was the only MTA manager whose performance was reviewed by a B/PB employee;

that in September, 2004, a white B/PB employee made obscene, disgusting and discriminatory anatomical gestures and remarks to the plaintiff, and that although the plaintiff reported this incident, B/PB did not investigate;

that on two occasions in 2004, B/PB manager Carol Hebb threatened or attempted to fire the plaintiff; and

that in June, 2005, the plaintiff was terminated by B/PB and the MTA acting in concert.

Those allegations, if accepted as true, are related in substance and occurred with such frequency and regularity over the course of the plaintiff's employment that they establish a serial continuing violation for purposes of tolling the statute of limitations under Title VII. Those allegations are made specifically against B/PB and if B/PB was, in fact, the plaintiff's joint employer, all of the allegations the plaintiff makes against the MTA may also be imputed to B/PB. None of the alleged incidents was perhaps so severe as to warrant the plaintiff to assert his right to file a charge of discrimination with the EEOC but taken together the allegations, if believed, are sufficiently related and continuous so as to constitute a continuing violation. *O'Rourke*, 235 F.3d at 731.

#### iv. Hostile Work Environment

 B/PB also contends that the allegations in the second amended complaint are insufficient to sustain a hostile work environment claim under Title VII as alleged in Count Two of the second amended complaint. In order to sustain an action under Title VII for hostile work environment, the plaintiff must allege that the discriminatory actions suffered were sufficiently "severe" or "pervasive" so as to alter the conditions of the victim's employment and create an abusive working environment. *Amtrak*, 536 U.S. at 116, 122 S.Ct. 2061. The allegations referred to above, if proven, are sufficient to sustain the plaintiff's hostile work environment claim. According to the allegations in the second amended complaint, the plaintiff was subordinated to a B/PB supervisor, repeatedly denied opportunities made available to his white counterparts, repeatedly threatened with the loss of his job and ultimately fired. The plaintiff was also allegedly subjected to an incident involving obscenities and physical humiliation by a white B/PB employee in September, 2004, which B/PB failed to investigate. Again, those allegations are specifically against B/PB and do not include the many additional charges against the MTA which may be imputed to B/PB under the joint employer theory. The plaintiff has alleged conduct that is sufficiently severe and pervasive to sustain an action for hostile work environment under Title VII.

For all of the reasons explained above, the discrimination claims arising under Title VII and Chapter 151B in Counts Two and Three will survive B/PB's motion to dismiss.

#### b. Motions to Dismiss Title VII and Chapter 151B Claims by the MTA and the MTA officials

The MTA does not move to dismiss the Title VII or Chapter 151B hostile work environment or discrimination claims that the plaintiff brings against it in Counts Two and Three. Those claims will therefore survive. The individual MTA officials, however, move to dismiss the Title VII and Chapter 151B claims because Title VII does not provide for individual liability.

 The MTA officials contend that claims arising under Title VII are only actionable against an employer as an entity, not against individual co-workers or supervisors. While the First Circuit has yet to address the question of individual liability under Title VII, all other circuits have found that individual liability is not permitted under Title VII. *See Horney v. Westfield Gage Co.*, 95 F.Supp.2d 29, 33 (D.Mass.2000) (citing cases from all other circuits holding that individual liability is not permitted under Title VII). Furthermore, this session of this Court has consistently held that individual liability is not permitted under Title VII. *See Ali v. Univ. of Massachusetts Med. Ctr.*, 140 F.Supp.2d 107, 109 (D.Mass.2001); *Herrera v. Boyd Coating Research Co.*, 983 F.Supp. 49, 50–51. The Title VII claims will, therefore, be dismissed against the MTA officials.

 The MTA officials also move to dismiss the claims arising under Chapter 151B because none of them was named in the discrimination charge filed with the EEOC. A complainant must name all parties in an administrative complaint, including individual defendants, or the action against them will be dismissed. *Chatman v. Gentle Dental Ctr. of Waltham*, 973 F.Supp. 228, 233–36 (D.Mass. 1997) (dismissing Chapter 151B claims against individual employees not named in MCAD administrative complaint). The discrimination claims against the MTA officials arising Chapter 151 will, therefore, be dismissed.

The MTA also moves to dismiss the Title VII allegation for retaliation under Count One of the second amended complaint. Count One alleges that the defendants' actions constituted "retaliation" against plaintiff's conduct which was "protected activity" under the laws of Massachusetts and the United States. Under Title VII, retaliation is actionable only if it retaliates against conduct that is protected under the statute. Protected conduct includes reporting on instances of employment discrimination. The plaintiff alleges that he suffered retaliation as a result of reporting on mismanagement and fraud within the Big Dig project but not for any reported instances of discrimination. The retaliation claim in Count One is more appropriately considered as being brought under the Massachusetts Whistleblower Statute discussed below. The Title VII claim for retaliation in Count One will, therefore, be dismissed.

### 7. Post–Employment Discrimination (Count Ten)

The plaintiff alleges in Count Ten that the defendants interfered with his future employment opportunities in violation of Title VII. That claim is based upon the defendants' alleged refusal to provide him with any recommendation letters or positive references upon request. The MTA has not moved to dismiss that claim and therefore Count Ten survives against the MTA. For the reasons stated above, Count Ten also survives with respect to B/PB for further factual development but is dismissed as to the individual MTA officials because Title VII does not provide for individual liability.

### 8. Whistleblower Allegations

In Counts Two, Three and Eight of the second amended complaint, the plaintiff cites the Massachusetts Whistle-

blower Statute, M.G.L. c. 149, § 185, as a basis for relief. The second amended complaint contains accusations which can be construed to constitute a cause of action against the plaintiff's employer for retaliation under that statute. As a preliminary matter, the Whistleblower Statute only protects an employee from retaliation for reporting the wrongdoing of his or her employer. It does not protect against other kinds of workplace discrimination. Curiously, however, the plaintiff cites the Whistleblower Statute in Counts Two (Hostile Work Environment), Three (Discrimination) and Eight (Wrongful Discharge in Violation of Public Policy), but not in Count One (Retaliation), where it would be appropriate. The Court will, nevertheless, treat the whistleblower allegation as a claim for retaliation under Count One but will dismiss such claims insofar as they relate to Counts Two, Three and Eight.

### a. B/PB Not an Employer Under the Statute

B/PB moves to dismiss any claims arising under the Whistleblower Statute because, it contends, the company is not an "employer" within the meaning of the law. The statute specifically defines an "employer" as:

[T]he commonwealth, and its agencies or political subdivisions, including, but not limited to, cities, towns, counties and regional school districts, or any authority, commission, board or instrumentality thereof.

M.G.L. c. 149, § 185(a)(2). B/PB is a joint enterprise of two corporations, not a state agency or political subdivision of the Commonwealth. Whatever the nature of the relationship between B/PB and the MTA, it cannot be said that B/PB is an instrumentality of the state based on a plain reading of the statute. The whistleblower

claims against B/PB will, therefore, be dismissed.

### b. No Individual Liability Under the Statute

 Similarly, the MTA officials move to dismiss because, they argue, the Whistleblower Statute does not provide for individual liability against supervisors or other employees of a state agency. Indeed, the statute provides only that an "employer shall not take any retaliatory action" against an employee. M.G.L. c. 149, § 185(b). The whistleblower claims against the MTA officials will, therefore, be dismissed.

### c. Procedural Requirement

The MTA moves to dismiss the whistleblower claims for a different reason. It does not dispute that it was the plaintiff's "employer" for purposes of the statute but contends that the plaintiff failed to provide it with the statutorily required written notice of his grievance. The statute provides that an employee must bring written notice of the alleged offensive activity to the attention of a supervisor and afford the employer a reasonable opportunity to correct the illegal or dangerous activity. M.G.L. c. 149, § 184(c)(1).

 In its motion to dismiss, the MTA asserts summarily that the plaintiff did not provide the requisite written notice to the MTA prior to filing his complaint. It may, however, have misconstrued the statutory notice requirement. Unlike the notice requirement under Title VII, which actually requires a plaintiff to file an administrative charge with the EEOC and obtain a release to file a lawsuit, the notice requirement under the Whistleblower Statute requires only that a potential plaintiff provide written notice to his or her employer regarding activity that is illegal or a risk to public health so that the

employer has an opportunity to correct that activity. The purpose behind the notice requirement is to afford an employer "an opportunity to clean up its own house" before the matter is taken outside the agency. *Dirrane v. Brookline Police Dep't.*, 315 F.3d 65, 73 (1st Cir.2002). The potential plaintiff is not required to file written notice that he or she has been retaliated against for reporting wrongdoing, as a claimant is required to do before instigating a Title VII action. *See Dirrane*, 315 F.3d at 72–73.

The plaintiff's second amended complaint alleges that he did provide the requisite written notice. He alleges that he reported a leak in a portion of the I–90 tunnel project in a written field report in August, 1994 and sent a memo to MTA personnel in June, 1999, and an email to an MTA director in September, 2004, reporting instances of fraud. Those actions, if taken, constitute "written notice" to a "supervisor" of the plaintiff's employer of activity that was either illegal or a risk to public health. M.G.L. c. 149, § 185(c)(1). The written reports allegedly provided by the plaintiff, if sent, afforded the MTA a reasonable opportunity to correct the wrongful conduct and the plaintiff asserts that he suffered retaliation for not "covering up" such activity. His claim against the MTA for relief under the Whistleblower Statute will, therefore, survive.

### 9. Civil Rights Claims under §§ 1981 and 1983

 The second amended complaint cites 42 U.S.C. §§ 1981 and 1983 as grounds for relief for retaliation, hostile work environment and discrimination in Counts One, Two and Three, respectively. Under § 1983, a plaintiff may recover for civil rights violations against a "person" acting "under color of" state law, which requires some kind of state action. Under

§ 1981, all "persons" within the jurisdiction of the Untied States are guaranteed the right to "make and enforce contracts." Although § 1981 is narrower in substance than § 1983, it applies explicitly to both state and non-governmental actors.

■ While the state counterparts of §§ 1981 and 1983, MCRA and MERA, are preempted by Chapter 151B under state law (as discussed above), §§ 1981 and 1983 are not automatically preempted by Title VII. *See Ofori–Tenkorang v. American Intern. Group, Inc.,* 460 F.3d 296, 301 (2d Cir.2006) ("Section 1981 sets forth a remedy for employment discrimination that is independent of Title VII"); *Annis· v. County of Westchester,* 36 F.3d 251, 254 (2d Cir.1994) (Observing that "every circuit that has considered this issue has held that Title VII is not the exclusive remedy for discrimination claims against state or municipal employers, where those claims derive from violations of Constitutional rights").

### a. Section 1981 and 1983 Claims Against B/PB

■ Claims under § 1983 require allegations of state action. B/PB is a private joint venture and is not a state actor, even though it may have been acting in concert with the MTA and may have been a joint employer of the plaintiff. The plaintiff's § 1983 claims will therefore be dismissed against B/PB for lack of state action.

Section 1981, however, gives individuals the right to make and enforce contracts with non-governmental entities. No state action is required to enforce rights under § 1981. As amended by the Civil Rights Act of 1991, to "make and enforce contracts" includes the "making, performance, modification, and termination" of contracts, and "the enjoyment of all benefits, privileges, terms and conditions" of the contractual relationship. 42 U.S.C. § 1981(b); *see Ofori–Tenkorang,* 460 F.3d at 301. The allegations in the plaintiff's second amended complaint could be construed as an interference with the plaintiff's right to enjoy the benefits, privileges, terms and conditions of his employment on the basis of his race. In any event, the facts and defenses to be developed under the § 1981 claim appear to be substantially similar to those which must be developed under the Title VII and Chapter 151B employment discrimination claims.

B/PB also contends that the § 1981 claim should be dismissed because the statute of limitations on § 1981 claims is four years and therefore relates only to events occurring after January 30, 2002. The plaintiff has alleged, however, discriminatory conduct by B/PB personnel after that date. Furthermore, the continuing violations doctrine may (or may not) apply to § 1981 claims, but that issue can be decided after further development of the factual record. The § 1981 claims against B/PB in Counts Two and Three, for hostile work environment and discrimination, respectively, will survive the motion to dismiss. The § 1981 claim in Count One for retaliation will be dismissed because § 1981 is not relevant to the plaintiff's retaliation claim which he is pursuing separately under the Whistleblower Statute.

### b. Section 1981 and 1983 Claims against the MTA Defendants

The MTA and the MTA officials raise two defenses to the §§ 1981 and 1983 claims: 1) that sovereign immunity shields the MTA from liability as an entity and 2) that qualified immunity shields the MTA officials from individual liability.

■ The MTA contends that, as an entity, it is shielded from liability under §§ 1981 or 1983 by virtue of the doctrine of sovereign immunity. The Eleventh

Amendment to the Constitution generally bars suits against a state, its departments and agencies unless the state has specifically consented to suit. No such waiver exists with respect to § 1983. *See Lipsett v. University of Puerto Rico*, 864 F.2d 881, 885 n. 6 (1st Cir.1988). While the First Circuit has not yet specifically decided whether § 1981 contains a waiver of Eleventh Amendment immunity, other courts have held that no such waiver of immunity exists. *See Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1196 (10th Cir.1998); *Silva v. Universidad de Puerto Rico*, 817 F.Supp. 1000, 1005 (D.P.R.1993). Based on the doctrine of sovereign immunity under the Eleventh Amendment, therefore, the §§ 1981 and 1983 claims against the MTA as an entity will be dismissed.

■ Under the doctrine of *Ex Parte Young* and its progeny, however, individual state officials acting in violation of the constitution or laws of the United States are stripped of their Eleventh Amendment immunity. 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). An individual acting in his or her official capacity may be sued for prospective injunctive relief to end an ongoing constitutional violation, or can be sued in his or her individual capacity for money damages. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

■ The MTA officials interpose the defense of qualified immunity which specially protects public officials from the specter of damages liability for "judgment calls" made in a legally uncertain environment. *Santana v. Calderon*, 342 F.3d 18, 23 (1st Cir.2003). Unless the plaintiff's allegations claim a violation of "clearly established" law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. *Id.* Immunity applies unless the facts establish that the alleged conduct violated a consti-

tutional right that was clearly established at the time of the alleged violation such that a reasonable officer would have known that the conduct at issue was unlawful. *Borges Colon v. Roman–Abreu*, 438 F.3d 1, 18–19 (1st Cir.2006).

■ Taking the allegations in the plaintiff's second amended complaint in the aggregate as true, the MTA may be liable for discriminatory conduct under Title VII or Chapter 151B and may also be liable for retaliatory conduct under the Massachusetts Whistleblower Statute. Indeed, the MTA has not even moved to dismiss the core Title VII discrimination claims against it. When considering the individual actions of each MTA official, however, it is uncertain whether any individual violated a clearly established constitutional right of the plaintiff. The actions of the MTA and the MTA officials complained of by the plaintiff, if they occurred, appear to have been motivated primarily by retaliatory intent as opposed to racial discrimination. It cannot be said that any single MTA official violated a clearly established constitutional right of the plaintiff. The plaintiff will have the opportunity to litigate his discrimination and whistleblower claims against the MTA and B/PB, which will survive this motion to dismiss but, based on the defense of qualified immunity, the §§ 1981 and 1983 claims against the individual MTA officials are dismissed.

III. *Conclusion*

In conclusion, what remains of the plaintiff's case is a whistleblower action against the MTA for retaliation (Count One), a Title VII and Chapter 151B action against the MTA and B/PB for race-based hostile work environment (Count Two) and discrimination (Count Three), a § 1981 action against B/PB for interference with the plaintiff's right to make and enforce contracts (Counts Two and Three), and a Title

VII claim against the MTA and B/PB for post-employment discrimination (Count Ten).

## ORDER

In accordance with the foregoing, the Court rules on the defendants' motions to dismiss as follows:

1) the Motion to Dismiss of Defendant Massachusetts Turnpike Authority (Docket No. 74) is, with respect to the plaintiff's claim for violation of the Massachusetts Whistleblower Statute, which will be treated as a claim for retaliation in Count One of the second amended complaint, DENIED; but is, in all other respects, ALLOWED with prejudice;

2) the Motion to Dismiss of Defendant Bechtel/Parsons Brinckerhoff (Docket No. 76) is, with respect to a) the Title VII, Chapter 151B and § 1981 claims for hostile work environment (Count Two), b) discrimination (Count Three) and c) the Title VII claim for post-employment discrimination (Count Ten) DENIED, but is, in all other respects, ALLOWED with prejudice;

3) the Motion to Dismiss of Defendants Matthew J. Amorello, Mike Lewis, Marie Hayman, Norman Chalupka, and James Esposito (Docket No. 78) is ALLOWED with prejudice;

4) the Motion to Dismiss of Defendant Joe Allegro (Docket No. 96) is ALLOWED with prejudice.

So ordered.