FAROUK MARTINS *vs.* UNIVERSITY OF MASSACHUSETTS
MEDICAL SCHOOL & others.[1]

No. 08-P-1343.

Suffolk. June 8, 2009. - October 30, 2009.

Present: LENK, BROWN, & GRAINGER, JJ.

*Limitations, Statute of. Anti-Discrimination Law,* Age, Race, Termination of
employment, Prima facie case, Burden of proof. *Civil Rights,* Termination
of employment. *Employment,* Discrimination, Termination, Retaliation.
*Massachusetts Commission Against Discrimination. Administrative Law,*
Exhaustion of remedies. *Libel and Slander.*

This court concluded that a civil action alleging discrimination in employment
was not time barred, where the running of the applicable statute of limita-
tions had been tolled by the plaintiff employee's action of filing a complaint
with the Massachusetts Commission Against Discrimination within 300
days of the conclusion of grievance proceedings into which the employee
had entered with the defendant employer within 300 days of the complained
of conduct. [628-629]

In a civil action alleging, inter alia, discrimination in employment on the basis
of race and age, the Superior Court judge erred in granting summary judg-
ment in favor of the defendants (the plaintiff's former employer and certain
members of the employer's staff), where the plaintiff employee, after
demonstrating that he was performing his job at an acceptable level and
that his termination occurred in circumstances that would raise a reason-
able inference of unlawful discrimination, presented evidence on which a
jury could reasonably find that the defendants' articulated reason for the
plaintiff's termination was a pretext and that the true reason was discrimina-
tory animus [629-630]; moreover, the judge erred in granting summary
judgment in favor of the defendants on the plaintiff's claims of retaliation,
where, because the defendants never adequately addressed these claims,
the summary judgment burden never shifted to the plaintiff, but even if it
had, the plaintiff placed the issues of motivation and causation into legitimate
dispute [630]; further, the judge erred in granting summary judgment in
favor of the defendants on the plaintiff's claim of intentional interference
with advantageous relations, which turned on whether the plaintiff met his
burden with respect to his discrimination claim [634].

In a civil action in which the plaintiff employee alleged, inter alia, discrimina-
tion in employment on the basis of race and age in violation of G. L.
c. 151B, the Superior Court judge properly granted summary judgment in

[1]Charles Cook, Nancy Kealey, and Anthony Zanette.

favor of the defendants on a claim under the Massachusetts Equal Rights Act, where G. L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections. [630-633]

This court declined to reach a claim that fell below acceptable standards of appellate argument. [633]

In a civil action alleging, inter alia, two claims of defamation, the Superior Court judge properly granted summary judgment in favor of the defendants, where, with respect to one claim, the plaintiff failed to demonstrate publication, and with respect to the other claim, the memorandum at issue was not defamatory on its face, and even if it were, the memorandum was subject to conditional privilege. [634]

In a civil action alleging, inter alia, breach of the covenant of good faith and fair dealing in an employment setting, the Superior Court judge erred in granting summary judgment in favor of the defendant employer, where the plaintiff provided sufficient record support to permit a jury to find that the defendant's employment policies applied to the plaintiff, and to decide whether the plaintiff suffered economic harm as a result of the loss of his right under these policies to an internal appeal. [634-635]

CIVIL ACTION commenced in the Superior Court Department on February 14, 2006.

The case was heard by *Nancy S. Holtz*, J., on a motion for summary judgment.

*Farouk Martins*, pro se.

*Jean Marie Kelley* for the defendants.

BROWN, J. The point of law we are required to clarify in this case is whether a complainant seeking a judicial remedy for discrimination who has satisfied his administrative requirements may bring parallel claims under G. L. c. 93, §§ 102-103, the Massachusetts Equal Rights Act (MERA), in addition to his G. L. c. 151B claims in court. Although the Supreme Judicial Court unequivocally answered this question in the negative in 1994, an element of uncertainty has crept into the case law. We now reiterate that where, as here, G. L. c. 151B remedies are or were available to a complainant, those remedies are exclusive, preempting the joining of parallel MERA claims on removal to court. Accordingly, we affirm the summary judgment entered in favor of the employer on the plaintiff's MERA claims here. As we conclude that the judge properly ordered summary judgment to enter on only two of the plaintiff's remaining five claims, further proceedings in the Superior Court will be required.

1. *Facts.* On de novo review of summary judgment, see *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007), we rehearse the facts of

record in their aspects most favorable to Martins. See *Chervin v. Travelers Ins. Co.*, 448 Mass. 95, 96 (2006).

In May, 2000, the Executive Office of Health and Human Services (EOHHS) hired Farouk Martins, a fifty-one year old black man, as a program manager to work in the benefit coordination and recovery unit (BCRU). Previously, Martins had worked as a manager at Boston City Hospital. At EOHHS, Martins managed the health insurance premium program. Martins was the only black manager in BCRU, the first black manager ever hired, and the oldest mid-level manager. Through the end of June, 2003, Martins received commendable and meritorious job evaluations.

In August or September, 2003, Nancy Kealey, the director of revenue operations of BCRU, selected Anthony Zanette for the position of revenue operations manager. Martins, who previously was above Zanette in the organizational chart, was required to report to Zanette. After initially rejecting the reporting relationship, Martins accepted Zanette's supervision rather than face disciplinary action.

During their individual meetings, Zanette repeatedly subjected Martins, over his objections, to coarse and vulgar language. Moreover, on several occasions, Charles Cook, the director of BCRU, threatened to put Martins "on the street where [he] belonged and replace [him] with a younger manager." Cook also expressed his view to Martins that city of Boston managers were not equal (i.e., inferior) to State managers. Notwithstanding the favorable job evaluations from Martins's immediate managers, Cook offered Martins a deal to leave BCRU, promising to give him any recommendation he wanted if he left voluntarily. Martins rejected the offer.

When the Commonwealth medicine revenue operations program at the University of Massachusetts Medical School (UMMS) took over the functions of the BCRU, the bulk of the BCRU staff transferred to UMMS. All BCRU staff were classified by UMMS as new hires subject to a six-month probationary period. Cook and Kealey became official UMMS employees before Martins in either 2002 or 2003.[2] On February 1, 2004, Martins became a UMMS employee, receiving the title of revenue

[2]Although Cook retired on January 1, 2004, he continued to work at UMMS as a consultant.

operations *assistant* manager, which Martins viewed as a demotion. At UMMS, Martins reported first to Kealey and then later to Zanette.

After learning about his new placement in late January, 2004, Martins complained about the discrimination to Susan Levine, his UMMS contact person. Levine subsequently assured him that she had looked into the matter and that the other similarly situated BCRU managers, all white, had received the same position and title at UMMS. When Martins received a contact list from a UMMS revenue operations program he attended in June, 2004, however, he learned that all his former colleagues had been made managers at UMMS.

Before Martins became a UMMS employee, Pat Hart, a contractor, at Zanette's request, documented inaccuracies in Martins's spreadsheets and other shortcomings in Martins's work. On several occasions at EOHHS and at UMMS, Martins complained to Zanette that he was unable to read the size nine font required on the spreadsheets. Zanette refused to allow Martins to use either a larger font size or capitals and abbreviations because the spreadsheets were expected to look a certain way and changes would cause the form not to run properly.

In March, 2004, Martins formally complained to Catherine Parker, UMMS's manager of employee and labor relations, and to Julie Forgione, the assistant director of UMMS, that he was being treated differently from other employees. Martins maintained that he was being ostracized, stripped of his managerial duties, and humiliated and insulted by Zanette in front of his coworkers.[3] Martins also specifically complained to Parker, Kealey, and Forgione about Zanette's continuing use of "obscene" language, asking that it be stopped.

Although Martins applied for higher level managerial posi-

---

[3] That assertion was not without record support. For example, a December 3, 2003, electronic mail message (e-mail) showed that Martins had not been invited to monthly managers' meetings. Cook told investigators looking into Martins's complaints in March of 2004 that when he took over as the director of BCRU, he was "not going to fire a middle aged black man first thing on the job"; instead, he had decided to "work around him." In their answer, the defendants admitted that the number of employees reporting to Martins had decreased from nine to five at EOHHS and then from five to one at UMMS. Finally, while all the other managers had been assigned offices as of January, 2004, Martins worked out of a small cubicle filled with files.

tions in March or April, 2004, he was passed over in favor of white applicants, including Zanette, who were more than ten years younger than Martins.

In April, 2004, Zanette and Kealey met with Martins to discuss performance issues. At the end of May, Zanette reported to Forgione an improvement in Martins's attitude, performance, and interaction with his customers. Forgione congratulated Zanette in turning around a difficult situation.

On June 3, 2004, Zanette completed his evaluation of Martins, rating him as meeting standards (the highest of the three available ratings) both overall and on six of eight categories.[4] Disappointed with the evaluation because Zanette had recently informed him that he "was doing a good job," Martins refused to sign it. After the evaluation, Zanette told everyone that he and Martins were getting along well.

In connection with its 2004 better government competition, the Pioneer Institute for Public Policy Research selected Martins's program for an award. On June 11, 2004, Kealey sent the members of the unit, including Martins, a memorandum congratulating them and commending them for their hard work.

A week later, during a routine meeting, Zanette yelled at Martins that "he [was] paying [Martins] and [he had] to do whatever it is he wants." When Zanette brought up the subject of mistakes on the spreadsheets again, Martins told Zanette that the font size needed to be increased. Zanette responded, "[Y]ou are too fucking old to see." Zanette then turned to Martins's appearance, exclaiming that he "look[ed] like fuck."[5] Zanette asked why Martins did not leave and find another job. As Martins got up and attempted to leave the room, Zanette told him "to sit the fuck down" as he was not finished with him. A coworker, Elsa Rodriguez, who was present during the altercation, corroborated Martins's account concerning Zanette's hostility and inappropriate conduct toward him.

Later that same day, Martins sent an electronic mail message (e-mail) to Zanette, requesting that Zanette keep their meetings

---

[4]In two categories, Martins received the middle rating ("needs improvement").

[5]Martins viewed this as a racist comment.

strictly at a professional level. On June 21, 2004, Martins reported Zanette to Kealey and to Forgione.

On June 28, 2004, Zanette informed Martins that his UMMS employment was terminated, advising him that UMMS's grievance procedure entitled him to a hearing on the matter. Parker made arrangements to have a State police officer in plain clothes, in addition to the usual security, present during the termination. After giving Martins fifteen minutes to pack his belongings, three individuals escorted Martins from the building. Martins had no history of violence or of making threats.[6] Kealey was unaware of armed security being used in connection with any previous employee terminations.

That evening, an interagency memorandum regarding the "personnel action" was sent by e-mail to the other tenants of 600 Washington Street, the building in which Martins had worked, and forwarded to UMMS's office staff. Employees were reminded not to let anyone, including "familiar faces," enter the workspace without an access card.

On some undisclosed date in July, 2004, Martins filed an internal discrimination complaint with UMMS's equal opportunity office. On November 1, 2004, following an investigation, the grievance proceedings ended unfavorably for Martins. On December 23, 2004, Martins filed his administrative complaint at the Massachusetts Commission Against Discrimination (MCAD).

2. *Discussion.* a. *Count I (G. L. c. 151B, §§ 4[1], 4[1C], & 4[4]).* (i) *Statute of limitations.* Most, if not all, of the discriminatory actions at issue in this litigation, including the demotions, failures to promote, retaliation, and termination, occurred between January, 2004, and June 28, 2004. Where, as here, the complainant entered into grievance proceedings with his employer concerning the alleged discriminatory acts within 300 days of the complained of conduct *and* filed his complaint at MCAD within 300 days of the conclusion of those proceedings, the statute of limitations was tolled during the pendency of those proceedings.[7]

---

[6]In a March 19, 2004, e-mail to Marlene Tucker, the assistant director of UMMS's equal opportunity office, Catherine Parker indicated that Kealey was worried about violence if UMMS terminated Martins. Kealey denied making this statement.

[7]Effective November 5, 2002, the limitations period was extended from six months to 300 days. MCAD's procedural rules were amended in July, 2004, to conform to the statute.

See G. L. c. 151B, § 5, as amended by St. 2002, c. 223, § 1; 804 Code Mass. Regs. § 1.10(2) (2004); *Silvestris* v. *Tantasqua Regional Sch. Dist.*, 446 Mass. 756, 770 (2006). Thus, factoring out that four-month period (July to November, 2004) here, Martins's MCAD complaint (filed in December, 2004) was timely as to all these complained of actions, and the statute of limitations does not bar this action.

To the extent that the defendants seek the affirmance of the summary judgment as to Cook individually, at least some of Cook's alleged discriminatory acts occurred within the statutory period. On this record, the defendants have failed to show that Cook was entitled to summary judgment based on a limitations defense. See *Silvestris* v. *Tantasqua Regional Sch. Dist.*, 446 Mass. at 766-767; *O'Connor* v. *Redstone*, 452 Mass. 537, 550-551 (2008).

(ii) *Race and age discrimination.* The defendants argue that Martins was unable to show not only that he performed his job at an acceptable level, a necessary element of his prima facie cases of race and age discrimination, but also that his termination occurred in circumstances that would raise a reasonable inference of unlawful discrimination. We disagree. Martins never received an unfavorable performance evaluation. Given Martins's "meet[ing] standards" performance evaluation, the positive feedback from Zanette, the Pioneer award, and the personal commendation from Kealey — all occurring in Martins's last month of employment — as well as the discriminatory remarks by Zanette, a decision maker, made one week before the termination, Martins met his stage-one burden under either formulation. See *Knight* v. *Avon Prod., Inc.*, 438 Mass. 413, 425-426 & n.9 (2003); *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. 34, 40-46 (2005); *Trustees of Health & Hosps. of Boston, Inc.* v. *Massachusetts Commn. Against Discrimination*, 449 Mass. 675, 682-683 (2007); *Somers* v. *Converged Access, Inc.*, 454 Mass. 582, 598 (2009).[8]

Martins met his burden at the third stage with proof of disparate

---

[8]Calling the question of his performance a "hotly contested credibility dispute," *Dragonas* v. *School Comm. of Melrose*, 64 Mass. App. Ct. 429, 443 (2005), Martins did not dispute that the defendants met their second-stage burden of articulating and producing credible evidence of a nondiscriminatory reason for his termination.

treatment that could be considered together with the strong prima facie evidence of adequate job performance. Here, upon transfer to UMMS, Martins was the only BCRU manager to receive the title and position of assistant manager. At UMMS, Martins repeatedly complained without success to senior management about Zanette's unprofessional language. No other manager was subjected to this abusive treatment. Moreover, in deviation of regular practice, armed security was hired to escort Martins, a middle-aged program manager with no history of violence, out of the building upon his termination. Based on this evidence, a jury could reasonably find that the articulated reason for Martins's termination was a pretext and that the true reason was discriminatory animus. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 118 (2000); *Somers* v. *Converged Access, Inc.*, 454 Mass. at 599.

(iii) *Retaliation.* Martins alleges that, as a result of his internal complaints of discrimination in late January, March, and June, 2004, he was effectively demoted and fired within a week of his last complaint. The defendants have not adequately addressed these claims in their brief. Because the defendants have failed to demonstrate the absence of a genuine issue of material fact on every relevant issue, the summary judgment burden never shifted to Martins here. See *Fortenbacher* v. *Commonwealth*, 72 Mass. App. Ct. 82, 85 (2008). In any event, even if the defendants did manage to shift the burden, Martins placed the issues of motivation and causation into legitimate dispute. See *Mole* v. *University of Mass.*, 442 Mass. 582, 591-592 (2004); *Ritchie* v. *Department of State Police*, 60 Mass. App. Ct. 655, 663-666 (2004). The claims should have been submitted to the jury.

b. *Count II (G. L. c. 93, § 103[a]).* In 1994, the Supreme Judicial Court held that "where applicable, G. L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 586 (1994) (finding plaintiff's discrimination claims under MERA barred). In that case, the plaintiff proceeded solely on a MERA claim in court, attempting to bypass both c. 151B and MCAD completely. See *id.* at 581. In contrast, the plaintiff in *Agin* v. *Federal White Cement, Inc.*, 417 Mass. 669 (1994), decided two weeks later, did attempt (without

success) to exhaust his remedies at MCAD before filing parallel c. 151B and MERA claims in the Superior Court.[9] See *id.* at 672. In an effort to provide guidance to trial court judges, the Supreme Judicial Court stated, "[S]hould a judge decide that G. L. c. 151B is or was available to the plaintiff, the plaintiff would have no viable c. 93, § 103, claim under the teaching of *Charland.*" Read together, these cases established that the right to file a parallel MERA claim in court turns not on the proper exhaustion of administrative remedies, but on the availability of a remedy under c. 151B.

*Jancey* v. *School Comm. of Everett,* 421 Mass. 482 (1995), appears to have blurred the bright-line rule. In that case, after timely complying with the procedural requirements of c. 151B, the plaintiffs filed claims in court under c. 151B and parallel claims, inter alia, under G. L. c. 149, § 105A, the Massachusetts Equal Pay Act, and MERA.[10] The Supreme Judicial Court concluded that the plaintiffs' parallel c. 149 claims, while subject to MCAD's administrative process, were not barred by the exclusivity provision of c. 151B, § 9. See *id.* at 495-497. The primary rationale for that conclusion was the clear evidence of legislative intent.[11] See *id.* at 496. In the part of the decision most relevant for present purposes, the court concluded that the "core" holding of *Charland* did not apply because the plaintiffs in *Jancey* had timely exhausted their remedies at MCAD. See *id.* at 498

---

[9]Agin claimed that MCAD had informed him that he could not file a complaint because his employer was not covered by c. 151B. Since it was unclear whether equitable tolling was appropriate, the Supreme Judicial Court remanded the case for further findings.

[10]After a bench trial solely on the c. 149 claims, a judge found in favor of the plaintiffs. The MERA claims were not otherwise mentioned in the Supreme Judicial Court's decision.

[11]The Supreme Judicial Court noted that, in 1965, the Legislature had added gender as a protected status and at the same time had added the anti-repeal language to c. 151B, § 9, specifically referencing c. 149. The court also applied the general rule of statutory construction requiring courts to interpret statutes, if possible, "in harmony with prior enactments to give rise to a consistent body of law." *Jancey* v. *School Comm. of Everett, supra* at 496, quoting from *Charland* v. *Muzi Motors, Inc.,* 417 Mass. at 583. Originally enacted in 1989 and 1990, MERA, unlike c. 149, significantly postdated the original enactment of c. 151B. See *Thurdin* v. *SEI Boston, LLC,* 452 Mass. 436, 440 (2008). In 2002, the Legislature streamlined the exclusivity provision of c. 151B, § 9, deleting the specific references to c. 149 and to other statutes. See *id.* at 441 & n.8.

n.14. The court also directed readers to *Agin,* which was analogous only to the extent that the plaintiff there had attempted exhaustion.

While recognizing the continuing import of *Charland* and *Agin,* some commentators read *Jancey* as holding out the possibility of parallel MERA and c. 151B claims proceeding in court as long as administrative remedies were properly exhausted.[12] See Moriearty, Adkins, Rubin, & Jackson, Employment Law §§ 10.1 & 10.4 (2d ed. 2003). The issue has caused confusion in the Superior Court, resulting in inconsistent decisions.

Any confusion should have been dispelled by our appellate courts, reaffirming the rule of preemption stated in *Charland* and *Agin.* See *Mammone* v. *President & Fellows of Harvard College,* 446 Mass. 657, 681 n.1 (2006) (Greaney, J., dissenting); *Carleton* v. *Commonwealth,* 447 Mass. 791, 812 (2006); *Cargill* v. *Harvard Univ.,* 60 Mass. App. Ct. 585, 604 (2004). Parallel MERA claims, however, have continued to appear in complaints filed in court.

Most recently, in *Thurdin* v. *SEI Boston, LLC,* 452 Mass. 436 (2008), the Supreme Judicial Court held that where a c. 151B remedy was unavailable, the employee had the right to bring a MERA claim in the first instance in court, a result entirely consistent with the rule of preemption.[13] See *id.* at 455. In a footnote, the court distinguished Federal law from Massachusetts law on the exclusivity issue: "[i]t appears that Federal law allows a suit

---

[12]So far as appears from our canvassing of the published case law, with only one exception, Federal courts have read c. 151B, as interpreted in *Charland* and *Agin,* to state a rule of preemption rather than exhaustion. Some Federal judges have found the case law from Massachusetts appellate courts to be unclear. Compare *McDonnell* v. *Certified Engr. & Testing Co.,* 899 F. Supp. 739, 750-751 (D. Mass. 1995), with *Woods* v. *Friction Materials, Inc.,* 30 F.3d 255, 264 (1st Cir. 1994); *Morrissey* v. *Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 n.2 (1st Cir. 1995). See *Edsall* v. *Assumption College,* 367 F. Supp. 2d 72, 81 (D. Mass. 2005); *Ahanotu* v. *Massachusetts Turnpike Authy.,* 466 F. Supp. 2d 378, 388 (D. Mass. 2006); *Svensson* v. *Putnam Invs. LLC,* 558 F. Supp. 2d 136, 146 (D. Mass. 2008); *Flipp* v. *Rockland,* 613 F. Supp. 2d 141, 146 (D. Mass. 2009).

[13]In *Thurdin,* it was undisputed that the plaintiff's employer had fewer than six employees and thus was not covered by c. 151B. After her administrative complaints were dismissed for want of jurisdiction, Thurdin filed one claim under MERA in court. The issue before the court thus concerned the viability of alternative remedies under MERA where c. 151B was inapplicable. No issue regarding parallel claims was before the court.

to be filed under [42 U.S.C.] § 1981 before an employee exhausts remedies under Title VII.''[14] *Id.* at 442 n.11. Without further comment, the Supreme Judicial Court noted that ''[i]t is beyond the scope of this appeal whether, once an employee chooses the judicial route, he or she also may assert a claim pursuant to [MERA].'' While that statement may signal an intention to reconsider the exclusivity rule in cases where c. 151B is applicable, that statement, at most, was dicta unnecessary to the holding in the case. See *id.* at 458 n.4 (harmonizing prior case law with *Thurdin* by indicating that the court was not changing the exclusivity rule in cases where c. 151B applies).

*Charland* and *Agin* remain good law and govern the result here. Martins's parallel discrimination claims under MERA are preempted by G. L. c. 151B and thus were properly dismissed.

c. *Count III (misrepresentation).* Because Martins's short conclusory argument in his brief falls below acceptable appellate standards, we deem these claims waived. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *Normandin* v. *Eastland Partners, Inc.*, 68 Mass. App. Ct. 377, 385-387 & n.10 (2007).

Were we to reach the merits, we would conclude that summary judgment was properly entered on this count, because the statements at issue were too vague and indefinite to induce reasonable reliance,[15] see *Saxon Theatre Corp. of Boston* v. *Sage*, 347 Mass. 662, 666-667 (1964), or because Martins cannot show any compensable detrimental reliance.[16] See *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 423-426 (2005).

---

[14]MERA was modeled on 42 U.S.C. § 1981, the Civil Rights Act of 1866. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., is the Federal counterpart to c. 151B. Employees are permitted to bring race-based discrimination claims under § 1981 in court in addition to, or independently of, c. 151B and Title VII claims. See *Thurdin* v. *SEI Boston, LLC*, 452 Mass. at 462 n.10 (Botsford, J., concurring). See also *CBOCS West, Inc.* v. *Humphries*, 128 S. Ct. 1951, 1960 (2008).

[15]By failing to address his claim regarding the false statement in UMMS's policy manual in his brief, Martins has waived it. See *Dragonas* v. *School Comm. of Melrose*, 64 Mass. App. Ct. at 436 n.21.

[16]To the extent Martins discusses new bases of liability in his brief, any claims, arguments, and issues raised for the first time on appeal are not properly here. See *Cariglia* v. *Bar Counsel*, 442 Mass. 372, 379 (2004).

d. *Count IV (intentional interference with advantageous relations).* To succeed on this claim, Martins must prove that, in interfering with his employment relationship, his former supervisors, Cook, Kealey, and Zanette, acted with an improper motive or means (i.e., actual malice). See *Blackstone* v. *Cashman*, 448 Mass. 255, 260-261, 269-270 (2007). See also *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 782-783 (2001). The defendants agree that the propriety of the summary judgment on the interference claims here turns on whether Martins met his burden with respect to his discrimination claims. We have already held that Martins's discrimination claims should have been submitted to a jury. It follows that Martins's interference claims should have been submitted to a jury in conjunction with them.

e. *Count V (defamation).* Below, Martins raised two defamation claims involving an alleged telephone threat and the June 28, 2004, e-mail. His first defamation claim, based on Zanette's statement to Martins's coworkers that Martins had made an "easily verifiable" threatening telephone call to him on the date of his termination, fails for lack of competent proof of publication. See *Correllas* v. *Viveiros*, 410 Mass. 314, 319 (1991).

The general memorandum sent by e-mail regarding the separation of an unnamed employee from employment and the reminder about the importance of workplace security, we think, was not defamatory on its face. See *Goldhor* v. *Hampshire College*, 25 Mass. App. Ct. 716, 723-724 (1988). Even if it could be deemed defamatory, Martins has failed to proffer specific facts sufficient to overcome UMMS's conditional privilege. See *Foley* v. *Polaroid Corp.*, 400 Mass. 82, 94-96 (1987); *Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. 550, 558 (2003). Summary judgment was properly entered on the defamation count.[17]

f. *Count VI (breach of the covenant of good faith and fair dealing).* In his complaint, Martins raised three separate claims. First, Martins claimed that UMMS had breached the covenant of good faith and fair dealing by refusing to refer his case to an appeal panel for review in violation of its own policies and procedures. UMMS successfully argued to the motion judge

---

[17]Again, any new theories of liability raised for the first time on appeal are deemed waived. See *Cariglia* v. *Bar Counsel*, 442 Mass. at 379.

that the policy did not apply to a probationary employee such as Martins. We think the judge erred. The application section of the discrimination complaint procedure states that "[t]hese procedures apply to *all* employees (including faculty), students, job applicants, and others who believe they may have been discriminated against . . ." (emphasis added). In light of this broad, inclusive language, a jury could find that the policy did apply to Martins. Compare *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 385-386, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash*, 546 U.S. 927 (2005). Martins has also provided record support for his allegation that UMMS deprived him of a deserved increase in his salary for the period from February 1, 2004, until he was terminated. This is sufficient to withstand a motion for summary judgment and to permit a jury to decide the issue whether any economic harm resulted from the loss of Martins's right to an internal appeal. Compare *id.* at 388.

Martins has provided no factual or legal support for the other two implied covenant claims briefly alluded to in his complaint. We deem those claims, as well as the other vague public policy and *Fortune*-type claims merely suggested in his brief, to be waived.

The summary judgment in favor of the defendants on counts II, III, and V is affirmed. The judgment on counts I, IV, and VI is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*